# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID KIVETT,** *Plaintiff* v. **NEOPHARMA, INC.,** *et al.*, *Defendants.* | Case No. 2:20-cv-00664-JDW |

## MEMORANDUM

Cediprof Inc. and Lannett Company entered into two contracts. David Kivett worked for years on a commission basis soliciting Lannett's business for Cediprof's corporate affiliate Neolpharma Inc. Now he claims that Cediprof's contract with Lannett triggered his commission. Cediprof and Neolpharma think otherwise because Mr. Kivett did not have a contract with Cediprof, and Neolpharma did not enter into a contract with Lannett. The Court concludes that those cause-and-effect questions are subject to factual disputes that prevent summary judgment on Mr. Kivett's breach of contract claim. But his fraud claim fails because the duty that he says Neolpharma and Cediprof breached is really a contractual one, so the gist of the action doctrine precludes the claim.

I.  FACTS

   A.  **Mr. Kivett's Relationship With Neolpharma**

Cediprof owns New Drug Applications ("NDA") and Abbreviated New Drive Applications ("ANDA") to sell and market pharmaceuticals, but it does not

manufacture anything. Neolpharma manufactures pharmaceuticals for which Cediprof owns an NDA or ANDA. Efram Compo owns 100% of Neolpharma's stock and 80% of Cediprof's stock, and the two companies share office space and have overlapping management.

On April 19, 2013, Mr. Kivett and Neolpharma entered into a Representation Agreement (the "First Representation Agreement"). In that agreement, Neolpharma retained Mr. Kivett as an "independent representative selling the services of Neolpharma" by "solicit[ing] the services that Neolpharma offers to the industry to include that of contract manufacturing and packaging . . . ." (ECF No. 33-7 at 2.) Neolpharma agreed to pay Mr. Kivett a monthly fee of $3,500.00 "for his services to represent and solicit sales on behalf of Neolpharma exclusively." Neolpharma also agreed to pay Mr. Kivett a commission "upon the successful completion of a Business Transaction between Neolpharma and a client directly related with the services provided by [Mr.] Kivett. . . ." (*Id.*) The commission amount varied depending on the type of client Mr. Kivett solicited. (*Id.*)

In 2019, Mr. Kivett and Neolpharma entered into another Representation Agreement (the "Second Representation Agreement"). The Second Representation Agreement is identical to the First Representation Agreement, except it eliminates the monthly payments to Mr. Kivett. It is unclear what led the parties to enter into the Second Representation Agreement or whether the First Representation Agreement had continued in effect until the execution of the Second Representation Agreement.

### B. Mr. Kivett's Work Soliciting Business For Neolpharma

Mr. Kivett worked to pursue new opportunities for Neolpharma, including with Dr. Reddy's Laboratories, Glenmark Pharmaceuticals, Alembic Pharmaceuticals, and Lannett Company. Mr. Kivett first contacted a representative from Lannett, Michael Block, on August 7, 2013. Although the initial email did not generate business for Neolpharma, Mr. Kivett continued to pursue a business relationship with Lannett and its representatives.

In 2018, Mr. Kivett learned that Lannett lost its contract to distribute Levothyroxine, so Mr. Kivett emailed Mr. Block suggesting that Neolpharma manufacture Levothyroxine for Lannett. Mr. Kivett's email interested Mr. Block, so Mr. Kivett set up a conference call between Neolpharma's and Lannett's executives to discuss Levothyroxine. The conference call did not result in an agreement between Neolpharma and Lannett.

### C. Cediprof's Deal With Lannett

In July 2019, Cediprof entered into a Distribution Agreement with Lannett (the "Lannett Agreement"), pursuant to which Lannett paid Cediprof $20 million to begin distributing Levothyroxine in August 2022. Lannett and Cediprof also entered into an Interim Distribution Agreement ("Interim Agreement"), pursuant to which Lannett began distributing Levothyroxine from August 2020 through July 31, 2022.

Both the Lannett Agreement and the Interim Agreement are "between Lannett Company, Inc., . . . and/or its Affiliates . . . and Cediprof, Inc., . . . and/or its

Affiliates. . . ." (ECF No. 33-11 at §1.01; ECF No. 33-12 at §1.3.) The agreements define "Affiliate" as

> any other person or legal entity directly or indirectly controlling or controlled by or under direct or indirect common control with such Party. For the purpose of this definition, 'control' when used with respect to a specified person or legal entity means the power to direct the management and policies of such person or legal entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(ECF No. 33-11 at §1.01; *see also* ECF No. 33-12 at §1.3.)

### D. Procedural History

Mr. Kivett filed this lawsuit in February 2020, after Neolpharma and/or Cediprof refused to pay him his commission on the $20 million Lannett Agreement. In his Amended Complaint, Mr. Kivett asserts breach of contract and fraud claims against Neolpharma and Cediprof. On March 26, 2021, Cediprof and Neolpharma moved for summary judgment arguing, *inter alia*, that the gist of the action doctrine bars Mr. Kivett's fraud claim and that he cannot succeed on his breach of contract claim because Neolpharma is not a party to the Lannett Agreement. The Motion is now ripe.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

## III. ANALYSIS

### A. Preliminary Matters

Although Mr. Kivett's Amended Complaint mentions transactions related to Dr. Reddy's Laboratories, Glenmark Pharmaceuticals, and Alembic Pharmaceuticals, it does not assert that Neolpharma owed Mr. Kivett a commission and failed to pay that commission in breach of its contractual obligation. Moreover, in his opposition brief, Mr. Kivett states that he is not seeking commission for these claims. Because these claims are not in the case, the Court has no basis to enter summary judgment, but it will hold Mr. Kivett to his position that he does not seek compensation for work done for those companies.

### B. Breach Of Contract

Contract interpretation is a legal issue for the Court to resolve. *See In re Energy Future Holdings Corp.*, 842 F.3d 247, 253 (3d Cir. 2016); *Commonwealth of*

5

*Pennsylvania v. UPMC*, 208 A.3d 898, 910 (Pa. 2019). When examining a contract, a court's goal is to ascertain the intent of the parties, as objectively manifested by them. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980). First, the court must make a preliminary inquiry whether the contract before it is ambiguous. *Stendardo v. Federal Nat'l Mortgage Ass'n*, 991 F.2d 1089, 1094 (3d Cir.1993). A contract provision is ambiguous if it is susceptible of two reasonable alternative interpretations. *Mellon*, 619 F.2d at 1011. Where the contract's written terms are not ambiguous and can only be read one way, the court will interpret the contract as a matter of law. *Stendardo*, 991 F.2d at 1094. If the contract is determined to be ambiguous, then the interpretation of the contract is left to the factfinder. *Id.*

To prevail on a breach of contract claim, a plaintiff must plead: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 884 (Pa. Super. Ct. 2000) (quoting another source). The parties do not dispute the third element of Mr. Kivett's breach of contract claim—Mr. Kivett's damages. But they have submitted evidence that creates a factual dispute about the remaining elements of Mr. Kivett's contract claim. Because the Court cannot resolve those issues, it must deny Neolpharma's summary judgment motion.

1. **Existence of a contract**

Nothing before the Court suggests that the First Representation Agreement lapsed before Mr. Kivett attempted to solicit Lannett's business. The First Representation Agreement does not have a termination date. In Pennsylvania, "[t]he

general rule is that when a contract provides that one party shall render services to another, . . . but does not specify a definite time or prescribe conditions which shall determine the duration of the relationship, the contract may be terminated by either party at will." *Cummings v. Kelling Nut Co.*, 368 Pa. 448, 451, 84 A.2d 323, 325 (1951). Nothing before the Court suggests that either Neolpharma or Mr. Kivett terminated the First Representation Agreement. To the contrary, Mr. Kivett's efforts to solicit Lannett's business in 2018 suggest that he was acting under a contract. Because there is no evidence that either party terminated the contract, the Court will assume that the First Representation Agreement remained in effect when Mr. Kivett contacted Lannett.

The Court is also unable to determine whether the Second Representation Agreement modified the First Agreement or terminated it and started a new contractual relationship. Unlike novation, "modification does not displace a prior valid contract; rather, the new contract acts as a substitute for the original contract, but only to the extent that it alters it." *Melat v. Melat*, 602 A.2d 380, 385 (Pa. Super. 1992). On the other hand, novation "may only be found where 'the evidence demonstrates the displacement and extinction of a valid contract, the substitution for it of a valid new contract, . . . a sufficient legal consideration for the new contract, and *the consent of the parties.*" *Id.* (quoting *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 486 (Pa. Super. 1984) (emphasis in original)). Because (a) the two agreements are essentially identical, (b) there is no evidence on the record as to the parties' intent, and (c) the Court must draw all reasonable inferences in favor of Mr. Kivett, the Court

will assume that the Second Representation Agreement modified the First Representation Agreement and that no novation occurred. Thus, to the extent Mr. Kivett performed work pursuant to his agreement with Neolpharma and Neolpharma entered into a "Business Transaction" as a result of that work, it owed Mr. Kivett a commission regardless of whether Mr. Kivett was acting pursuant to the First Representation Agreement or the modified version of that agreement. This result is consistent with Pennsylvania law, which holds that "generally [Courts] will not divest an employee's right to an earned commission" where a contract is silent or ambiguous. *Little v. USSC Grp., Inc.*, 404 F. Supp. 2d 849, 854 (E.D. Pa. 2005) ("[A]n employee selling on a commission basis is entitled to his or her commission on a sale when the sale is made and accepted by the employer.").

Neolpharma tries to avoid this outcome by citing to an unpublished decision, *Antonelli v. Youth Educ. in the Arts!*, No. 19-CV-3927-JMY, 2020 WL 1042424, at *3 (E.D. Pa. Mar. 3, 2020). But *Antonelli* is distinguishable from Mr. Kivett's case because the plaintiff in *Antonelly* performed work prior to the express start date of his employment contract and admitted to volunteering for the organization he was suing before he signed the contract. That's not the case here. When the Court resolves all factual disputes in Mr. Kivett's favor, as it must, the record demonstrates that Mr. Kivett and Neolpharma were parties to a contract from 2013 forward, without interruption.

## 2. Breach of a contractual duty

Under the First Representation Agreement, Neolpharma owes Mr. Kivett a commission if it enters into a "Business Transaction." Although it uses capital letters, the Agreement does not define "Business Transaction." The Court will therefore give the term its ordinary meaning. *See Vogel v. Berkley*, 511 A.2d 878, 881 (Pa. Super. 1986) ("The ordinary meaning must be attributed to the language, unless a different meaning was clearly intended."). Mr. Kivett entered the First Representation Agreement in 2013 and Second Representation Agreement in 2018. At both times, "business transaction" meant an "action that affects the actor's financial or economic interests, including the making of a contract." Black's Law Dictionary 227 (9th ed. 2009); *see also* Black's Law Dictionary 241 (10th ed. 2014). Thus, under the Representation Agreement, if Neolpharma entered into a contract with Lannett, it owes Mr. Kivett a commission.

Both the Lannett Agreement and the Interim Agreement state that they are made "between Lannett Company. . . and Cediprof . . . and/or its Affiliates." Both Agreements define Affiliates as "any other person or legal entity directly or indirectly controlling or controlled by or under direct or indirect common control with such Party." (*E.g.*, ECF No. 33-11 at § 1.01.) The Agreements also state that "control" means "the power to direct the management and policies of such person or legal entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise." (*Id.*) Mr. Campo directly controls both Neolpharma and Cediprof. Neolpharma therefore qualifies as Cediprof's affiliate under the Lannett Agreement

and the Interim Agreement, and each agreement describes Cediprof's affiliates as parties to the agreement. All of which leads to the conclusion that Neolpharma is a party to an agreement with Lannett that affects its financial or economic interests and therefore qualifies as a "Business Transaction" under the First Representation Agreement.

The language of the Lannett Agreement and the Interim Agreement is not the only reason to conclude that Neolpharma is a party to those agreements (though the language alone is enough). Both agreements anticipate that Lannett will distribute products that Cediprof manufactures, but Cediprof does not manufacture anything. Only Neolpharma does. Thus, even if there were some ambiguity to the language of the Lannett Agreement and the Interim Agreement (and the Court sees none), the evidence viewed in Mr. Kivett's favor would still support the conclusion that Neolpharma owes Mr. Kivett a commission.

Defendants argue that Mr. Kivett should not get a commission because he was not involved in the formation of the Lannett Agreement or the Interim Agreement. But the First Representation Agreement did not require his involvement. Under that contract, Mr. Kivett must "solicit services that Neolpharma offers to the industry. . . ." "Solicit" means "an attempt or effort to gain business." Black's Law Dictionary 1520 (9th ed. 2009). The parties do not dispute that Mr. Kivett sent multiple emails to Mr. Block attempting to sell Neolpharma's services. Thus, under this definition, Mr. Kivett performed under the contract by soliciting Lannett's business. A jury might conclude that those efforts did not lead to the Lannett

Agreement or the Interim Agreement. But that's a factual dispute not appropriate on summary judgment and the Court will not make such a determination.

C.     Fraud

The gist of the action doctrine "prevents a party from bringing 'a tort claim for what is, in actuality, a claim for breach of contract.'" *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, 870 F.3d 244, 256 (3d Cir. 2017) (quoting *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract." *Bruno*, 106 A.3d at 68. On the other hand, if the "facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." *Id.*

While the applicability of the doctrine is a matter of law, *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 724 (E.D. Pa. 2014), the Pennsylvania Supreme Court has not articulated a standard by which to determine if a claim implicates a broader social duty owed to all individuals. Indeed, the Third Circuit has recognized that the gist of the action doctrine "cannot be captured by any precisely worded test. Instead, [it calls] for a fact-intensive judgment as to the true nature of a claim." *Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 386 (3d Cir. 2004); *see also*

*Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding*, LLC, 784 F.3d 177, 186 (3d Cir. 2015).

Similarly, the economic loss doctrine bars a tort plaintiff from recovering purely economic damages. However, the Pennsylvania Supreme Court has held that "purely economic losses are recoverable in a variety of tort actions" and that "a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law." *Dittman v. UPMC*, 196 A.3d 1036, 1053 (Pa. 2018) (quote omitted). Thus, if a "duty arises under a contract between the parties, a tort action will not lie from a breach of that duty. However, if the duty arises independently of any contractual duties between the parties then a breach of that duty may support a tort action." *Id*. This decision renders the gist of the action doctrine and the economic loss doctrine effectively coextensive under Pennsylvania law.

Mr. Kivett alleges that Neolpharma "subvert[ed] its agreement with [Mr.] Kivett to avoid paying any commission" by having Cediprof enter the Lannett Agreement. (ECF No. 22 at ¶ 89.) In essence, Mr. Kivett says that Neolpharma had a duty to pay him the commission and avoided that duty through its subsidiary. But whatever duty Neolpharma owed Mr. Kivett arose out of their contractual relationship. Thus, the gist of the action doctrine bars Mr. Kivett's breach of contract claim.

To the extent, Mr. Kivett argues that Neolpharma fraudulently induced him to enter into the Representation Agreement in the first place, that argument is

without merit. Mr. Kivett does not claim that he entered into the Representation Agreement because of Neolpharma's misrepresentation about its corporate structure. Rather, he asserts that *after* he entered into the Agreement and performed his side of the bargain, Neolpharma avoided its contractual obligation through fraud. Permitting this fraud claim to go forward would swallow the gist of the action doctrine in its entirety. A plaintiff could bring a fraud claim anytime he asserted that the defendant never intended to abide by its contract in the first place.

## IV.  CONCLUSION

Mr. Kivett's dispute with Neolpharma is a contractual one. He cannot repackage it as a tort claim. Therefore, the Court will grant summary judgment on Mr. Kivett's fraud claim (Count II). But it will not do so on his breach of contract claim (Count I) because the facts viewed in the light most favorable to Mr. Kivett establish that he had a valid contract with Neolpharma and that Neolpharma breached it. An appropriate Order follows.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge

May 27, 2021