**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DAVID KIVETT,**<br><br>_Plaintiff,_<br><br>v.<br><br>**NEOLPHARMA, INC.; CEDIPROF, INC.;**<br>**and NEOLPHARMA INTERNATIONAL,**<br>**S.A. DE C.V.,**<br><br>_Defendants._ | **Case No. 2:20-cv-00664-JDW** |

**MEMORANDUM**

David Kivett claims that Neolpharma, Inc. ("Neolpharma") violated a representation agreement by failing to pay a commission. The Court held a bench trial on liability and damages. After thorough consideration of the evidence presented at trial and relevant law, the Court makes the following findings of fact and conclusions of law pursuant to Fed R. Civ. P. 52(a).

## I.      FINDINGS OF FACT

### A.      Ownership And Administration Of Cediprof And Neolpharma

1.      Cediprof owns New Drug Applications ("NDA") and Abbreviated New Drug Applications ("ANDA") to sell and market pharmaceuticals. Among these are the NDA for Levothyroxine ("Levo"), which Cediprof owned at all times relevant to this matter.

2.      Cediprof does not manufacture anything. Neolpharma is the sole manufacturer for Cediprof products. From 2013 to the present, Neolpharma has not owned any NDAs or ANDAs.

3.      Marco Monrouzeau is the Chief Financial Officer and Vice President of Administrations for both Cediprof, Inc and Neolpharma, Inc. He has served as the CFO for both companies since 2013, and as the VP of Administrations since May 2020. As CFO for each company, he is responsible for all accounting, treasury, budgets, banking relationships, and new business for Cediprof and Neolpharma.

4.      From 2017 to May 2020, Mr. Monrouzeau was the General Manager of Cediprof and was responsible for all employees at Cediprof and Neolpharma.

5.      Neolpharma and Cediprof maintain the same address and offices.

6.      The majority of the executive structure for both companies is the same, including, among others, the general manager, manager of human services, manager of human resources, manager of supply chain, and manager of quality assurance.

7.      Neolpharma International S.A. DE C.V. ("Neolpharma International") owns Neolpharma. The Ocampo family owns Neolpharma International. Neol de Mexico owns Cediprof, and the Ocampo family owns 80% of Neol de Mexico. Thus, the Ocampo family controls both Cediprof and Neolpharma.

**B.      Mr. Kivett's Contractual Relationship With Neolpharma**

8.      On April 29, 2013, Mr. Kivett entered into a contract with Neolpharma (the "First Representation Agreement"). Neolpharma drafted the First Representation Agreement.

9.      Under the First Representation Agreement, Mr. Kivett served as an "independent representative selling the services of Neolpharma." (Ex. 9 at 3.[1]) It tasked Mr. Kivett with "solicit[ing] the services that Neolpharma offers to the industry to include that of contract manufacturing and packaging ...." and "possibly uncovering other opportunities via drug licensing and or R&D development project which could generate commissionable orders."  (*Id.*)2

10.     The First Representation Agreement contemplates several different forms of compensation to Mr. Kivett:

a.      Mr. Kivett received a monthly payment of $3,500;

b.      For the completion of any "Business Transaction between Neolpharma and a client directly related with the services" that Mr. Kivett provided, Mr. Kivett received a "standard maximum success fee of 3%." (*Id.*) However, if Neolpharma's "[g]ross margin" on any transaction would be less than 10%, then Mr. Kivett's commission was to be 10% of Neolpharma's gross margin. (*Id.*) The parties agreed to calculate "Gross Margin" as "Sales Price-Labor at standard-Overhead at standard-Materials at standard."

---

[1] Citations to "Ex." refer to Exhibits admitted into evidence at trial.

(*Id.*) Neolpharma had to pay Mr. Kivett "not later than 30 days after a successful business transaction is completed" (*id.* at 4); and

       c.     For the completion of a "Capital Transaction," Neolpharma had to pay Mr. Kivett a "2.5% success fee from the gross estimated transaction value" within "30 days from the execution of the Capital Transaction." (*Id.* at 4.) The First Representation Agreement does not define "Capital Transaction."

       11.     On November 29, 2018, Neolpharma cancelled the First Representation Agreement and indicated its intent "to continue doing business with [Mr. Kivett" and negotiate a new Representation Agreement under mutually agreed conditions and terms." (Ex. 38 at 2.) In its letter, Neolpharma indicated its desire to "provide continuity to our Business [sic] relationship." (*Id.*)

       12.     On December 8, 2018, Mr. Kivett and Neolpharma entered into a modified Representation Agreement ("Second Representation Agreement"). Neolpharma drafted the Second Representation Agreement. The only substantive change between the First Representation Agreement and the Second Representation is that the Second Representation Agreement eliminated the monthly payment to Mr. Kivett. (*See* Ex. 14.)

       13.     Mr. Kivett has not entered into any contracts with Cediprof or Neolpharma International.

### C.      Mr. Kivett's Work For Neolpharma

14.      Neolpharma did not provide Mr. Kivett any business contacts. Instead, he relied on his own industry contacts to develop opportunities for Neolpharma.

15.      When Mr. Kivett developed new contacts interested in Neolpharma or Cediprof products or services, he would set up a meeting with Edwin Placeres of Neolpharma, who would present to the potential client and coordinate visits to Puerto Rico. Mr. Kivett did not engage in pricing or negotiations with customers.

16.      Mr. Kivett summarized his new contacts and expenses in a document he provided each month to Mr. Placeres.

17.      On April 7, 2013, Mr. Kivett emailed Michael Block, Manager of Business Development at Lannett Company, to introduce Lannett to business opportunities with Neolpharma. Prior to this email, no representative from Neolpharma nor Cediprof had any contact with Lannett. This initial communication did not result in a business deal, but Mr. Kivett remained in contact with Lannett as part of his work for Neolpharma.

18.      In an email dated January 13, 2017, Mr. Kivett identified Lannett as a company with whom Neolpharma had "active opportunities." (Ex. 2.)

19.      On July 10, 2018, Mr. Kivett contacted Mr. Block to set up a meeting with Mr. Placeres regarding a list of eight to ten products that Lannett was considering outsourcing and to arrange a visit to audit Neolpharma's facility in Caguas, Puerto Rico.

20.     On August 20, 2018, Mr. Kivett saw a press release indicating that Lannett had lost its deal with Jerome Stevens for the distribution of Levo in the United States. That same day, Mr. Kivett forwarded the press release to Mr. Placeres and wrote, "maybe we could make Levo for Lannett." (Ex. 39.)

21.     Later that same day, Mr. Kivett emailed Mr. Block, stating "why don't we make Levothyroxine for you? Just a thought! Obviously, it's above my pay grade to make that decision, but it is something to discuss at our meeting." (Ex. 40.) Mr. Block responded, "That sounds great. If you would like to leave Sandoz for us that sounds wonderful! We are ready to work with you." (Ex. 7.)

22.     Near the end of August 2018, Mr. Kivett set up a meeting between Mr. Block and Mr. Placeres at which the parties discussed Levo, among other potential deals. That meeting did not result in a deal, though.

23.      Shortly after the August 2018 meeting, representatives from Lannett travelled to Puerto Rico to perform the audit of Neolpharma's Caguas facility. Mr. Kivett met with the Lannett representatives at the facility in Puerto Rico. This meeting marked the first contact between Mr. Monrouzeau and any Lannett representative.

24.     Mr. Kivett did not participate in any negotiations with Lannett or discussions about pricing. And the meeting did not result in any immediate negotiations or deals between Lannett and Neolpharma (or Cediprof).

25.     Before entering any deal, Mr. Monrouzeau and his finance department would evaluate whether Neolpharma would generate a gross margin below 10%.

**D.     The Cediprof/Lannett Agreements**

26.     On July 3, 2019, Cediprof and Lannett entered into an agreement (the "Main Lannett Agreement"). The Agreement provides that it is made between Lannett and its "Affiliates" and Cediprof and its "Affiliates." (Ex. 41 at 1.) It defines an "Affiliate" as "any other person or legal entity directly or indirectly controlling or controlled by or under direct or indirect common control with such Party" and specifies that "control" means "the power to direct the management and policies of such person or legal entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise." (*Id.*)

27.     In the Main Lannett Agreement, Lannett paid $20,000,000 to Cediprof "to obtain certain future rights and obligations associated with the Cediprof Products listed on Exhibit A," and "to engage Cediprof on an exclusive basis to manufacture, supply, package and label the Products." (Ex. 41.)

28.     Also on July 3, 2019, Cediprof and Lannett entered a Distribution Agreement (the "Lannett Distribution Agreement") to begin "manufacturing and supplying various pharmaceutical Products, including Levothyroxine Tablets…" (Ex. 43.) The Lannett Distribution Agreement had an effective date of no later than August 1, 2022,

7

and provided it was made between Cediprof and its "Affiliates," with the same definition as in the Main Lannett Agreement.

29.    In 2020, Lannett and Cediprof entered into an Interim Distribution Agreement (the "Interim Lannett Distribution Agreement" and, together with the Main Lannett Agreement and the Lannett Distribution Agreement, the "Lannett Agreements"), effective August 1, 2020 through July 31, 2022. Again, the Interim Lannett Agreement provides that it is made between Cediprof and its "Affiliates," with the same definition of "Affiliate."

30.    Neolpharma manufactured Levo for Lannett under the Interim Lannett Distribution Agreement. Neolpharma began producing Levo for Lannett on August 1, 2020. When Lannett wanted to order Levo under the agreement, it did so by submitting a Purchase Order to Neolpharma.

31.    Mr. Kivett learned about the deal between Cediprof and Lanett via a press release from Lannett.

32.    Upon learning about the deal, Mr. Kivett emailed an invoice for his services to Mr. Monrouzeau. Mr. Monrouzeau responded, "David I think you have the wrong information the 20 million are not revenue are an advance for services to be performed by a Service Agreement for several years. Also Lannett CMO business that originally they presented never was materialized." (Ex. 3.) Mr. Kivett never received commission for the Lannett transaction.

33.     Neolpharma's net sales of Levo to Lannett from August 2020 to October 2021 were $15,662,747.88 (ECF No. 64 at 143:1-3; Exs. 52, 53, 67.)

## II.     CONCLUSIONS OF LAW

1.     Neither side has addressed what law governs the Second Representation Agreement; instead, both sides have assumed that Pennsylvania law applies. The Second Representation Agreement does not contain a choice of law provision, and its parties are from different jurisdictions. As a federal court sitting in diversity, the Court applies Pennsylvania's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Pennsylvania applies a flexible rule that directs courts to apply the law of the state with the "most interest in the problem." *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010) (quote omitted). In this case, Neolpharma hired Mr. Kivett to perform work out of his home in Pennsylvania, and Neolpharma would realize those benefits in Puerto Rico. The Court concludes that Pennsylvania has at least as strong an interest as Puerto Rico in the case. That, coupled with the Parties' apparent agreement that Pennsylvania law applies, is enough for the Court to apply Pennsylvania law.

2.     The elements of breach of contract under Pennsylvania law are: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages. *See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

3.      Under Pennsylvania law, "[w]hen interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Doe v. Univ. of Scis.*, 961 F.3d 203, 212 (3d Cir. 2020) (quoting *Halpin v. LaSalle Univ.*, 639 A.2d 37, 39 (Pa. Super. Ct. 1994)). Therefore, the Court must begin by examining "the express language of the agreement." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quotation omitted). If that language is clear and unambiguous, the Court must follow its plain meaning. *See Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012). A court should construe the terms of a contract in their "natural, plain, and ordinary sense," and can inform its understanding by considering dictionary definitions." *Madison Cons. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999).

### B.      Claims Against Cediprof And Neolpharma International

4.      Neither Neolpharma International nor Cediprof entered into a contract with Mr. Kivett. Mr. Kivett's breach of contract claim against each of those entities therefore fails at the first element.

### C.      Claim Against Neolpharma

5.      The Second Representation Agreement governs any commission that Neolpharma owes to Mr. Kivett because the Second Representation Agreement was in effect when Cediprof and Lannett executed the Lannett Agreements. The Parties agree. (*Compare* ECF No. 66 at ¶¶ 49-52 *with* ECF 69 at ¶ 4, 5, 9, 14.)

6.      The Second Representation Agreement applies to a Business Transaction or a Capital Transaction "between Neolpharma and a client ...." (Ex. 14 at 1, 2.) Although Neolpharma did not sign any of the Lannett Agreements, the agreements do qualify as agreements between Neolpharma and Lannett because Neolpharma qualifies as Cediprof's "Affiliate" under each of the Lannett Agreements, and those agreements state that they are made between Cediprof "and/or its Affiliates." (*E.g.*, Ex. 41 at 1.) The Court reached that conclusion in denying Defendants' summary judgment motion, and nothing that occurred at trial caused it to change that conclusion.

7.      The Lannett Agreements constitute Business Transactions, not Capital Transactions. The Second Representation Agreement does not define either term, but context clues lead to that conclusion. The term "Business Transaction" appears in a series of bulleted paragraphs under the heading "Contract Manufacturing and packaging transactions." (*Id.*) Those paragraphs also contemplate commissions for "possible licensing agreements." (*Id.*) The term "Capital Transaction" appears under the heading "Product Acquisition success fee (NDA's, ANDA's)." (*Id.* at 2.)

8.      From that, the Court concludes that a "Capital Transaction" is one involving the acquisition of an asset, primarily an NDA or ANDA, and a "Business Transaction" is one for ongoing business that does not result in the transfer of an asset, including manufacturing and packaging. With those definitions in mind, the manufacturing and/or

packaging that Neolpharma did pursuant to the Lannett Agreements falls within the definition of "Business Transaction."

9.      The Second Representation Agreement makes Neolpharma liable for any Business Transaction that is "directly related with the services provided by Kivett hereunder." (Ex. 14 at 1.) The Agreement does not define "directly related," so the Court must give those words their plain, ordinary meaning.

10.      At the time that the Parties executed the Second Representation Agreement, "directly" meant "without anyone or anything intervening." The American Heritage Dictionary 512 (5th ed. 2018). "Related" meant "being connected; associated." *Id.* at 1482. Thus, the phrase "directly related" meant that there had to be an uninterrupted connection from Mr. Kivett's efforts on behalf of Neolpharma to the Lannett Agreements.

11.      The evidence demonstrates that the Lannett Agreements resulted directly from Mr. Kivett's efforts. Mr. Kivett was the first Neolpharma representative to contact Lannett on Neolpharma's behalf, in 2013. He maintained contact with Lannett for several years. In 2017, he proposed to Lannett that Neolpharma could make Levo for Lannett. And he arranged a meeting between Lannett and Neolpharma in August 2018. Then, in July 2019, Cediprof and Lannett executed the Lannett Agreements, which planned for Cediprof and its Affiliates (including Neolpharma) to manufacture Levo for Lennett. At the time, Cediprof expected Neolpharma to manufacture the Levo for Lannett because Cediprof did not manufacture anything for itself. This constitutes the type of unbroken

chain of causality that makes the Lannett Agreements "directly related" to Mr. Kivett's efforts.

12.     Of note, the Second Representation Agreement suggests that the execution of the Lannett Agreements was close enough in time to suggest a direct link to Mr. Kivett's work. The Second Representation Agreement provides that Mr. Kivett would receive a commission for any agreement that Neolpharma executed with a company for three years after Neolpharma terminated the Second Representation Agreement. That provision suggests that Neolpharma and Mr. Kivett expected that it might take as long as three years for Mr. Kivett's efforts to bear fruit in the form of a signed agreement. The Lannett Agreements were signed less than a year after Lannett personnel visited Neolpharma, well within the timeframe that the Parties appear to contemplate as directly related to Mr. Kivett's efforts.

13.     Defendants have not offered any credible evidence to the contrary. At trial, Mr. Monrouzeau testified that "Cediprof ... put out RFPs for different companies to do distribution deals when the date came[]" and that "Lannett was one of the companies that issued an answer to the request for proposal." (ECF No. 64 at 99:19-101:9, 132:2-10.) If that were true, it might disrupt the chain of causation and take the Lannett Agreements outside the scope of the Second Representation Agreement. But the testimony was not credible. There are no documents in the record to support the idea that Cediprof engaged in an RFP, let alone that multiple companies bid for the opportunity. That absence of

proof, coupled with the Court's observation of Mr. Monrouzeau, leads it to conclude that his testimony on that issue was not credible. Without that evidence, the preponderance of the evidence supports the conclusion that Mr. Kivett's work led directly to the Lannett Agreements. Mr. Kivett is entitled to a commission as a result.

14.     Under the Second Representation Agreement, Neolpharma had to pay a commission of 3% of the net sales for a Business Transaction unless the gross margin from the transaction was less than 10%.

15.     Under Pennsylvania law, the party seeking to invoke a contractual provision for its benefit bears the burden of proving the provision applies. *See John Spearly Const., Inc. v. Penns Valley Area Sch. Dist.*, 121 A.3d 593, 604 (Pa. Commw. Ct. 2015) (burden to establish immunity under an exculpatory clause is on the party asserting it); *Consol. Rail Corp. v. ACE Prop. & Cas. Ins. Co.*, 182 A.3d 1011, 1027 (Pa. Super. Ct. 2018) (burden to prove whether contractual exception applies on the party asserting it). The provision that could adjust Mr. Kivett's success fee to 10% of Neolpharma's gross margin benefits Neolpharma because it reduces the amount Neolpharma might owe to Mr. Kivett. Thus, Neolpharma bears the burden of proving that provision applies.

16.     Neolpharma offered no evidence at trial to permit the Court to conclude that the gross margin on any of the Lannett Agreements was less than 10%. At trial, Mr. Monrouzeau testified about calculations that he performed about the actual costs that impacted Neolpharma's gross margin. But the Second Representation Agreement

specifies that Neolpharma must make the calculation using standard costs, not actual

costs. Neolpharma did not introduce any evidence about the standard costs, let alone

how those standard costs might impact its gross margin. It therefore has not carried its

burden of demonstrating that the commission should be based on gross margin, rather

than on net sales.

17.     Because Mr. Kivett's contract is with Neolpharma, he is only entitled to a

commission based on Neolpharma's net sales to Lannett. He is not entitled to revenues

that Lannett paid to Cediprof as a licensing fee or for other purposes.

18.     From August 2020 (when Neolpharma first made Levo for Lannett) through

October 2021, Neolpharma's net sales to Lannett total $15,662,747.88. Mr. Kivett is

entitled to a commission of 3% of that amount, totaling $469,882.41.

19.     Although it is clear from the Lannett Agreements and testimony at trial that

Neolpharma continues to manufacture Levo for Lannett, the Court has no basis to

determine the amount of sales. Testimony at trial indicates that sales to Lannett are

declining, but there was no indication of how much. In addition, Mr. Monrouzeau testified

that competition in the market has driven the price of Levo down by about 70%. Given

these variables, the Court has no way to know how much Levo Neolpharma has sold or

will sell to Lannett after October 2021 or to project the net sales on those sales.

20.     Breach of contract damages cannot be based on a guess or speculation, but

courts can fairly estimate them from the evidence, even if there is not mathematical

certainty. *See Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866-67 (Pa. 1988). Because

there is no evidence regarding future sales, the Court cannot award Mr. Kivett any

damages for any period after October 2021 without making a litany of assumptions that

would render any damages amount nothing more than a guess. The Court notes, though,

that given the declining sales and the need to discount future sales to present value, the

likelihood that future sales will have substantial economic value is low.

## III.     CONCLUSION

Mr. Kivett has demonstrated by a preponderance of the evidence that he is entitled

to a commission for the Lannett transaction. The Court will award damages in accord with

these findings of fact and conclusions of law. Based on the combined calculation of actual

and projected commissions on Net Sales, Mr. Kivett is entitled to $469,822.41. An

appropriate Order follows.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
Hon. Joshua D. Wolson
United States District Judge

April 21, 2022